**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**

**CIVIL CASE NO. 1:11cv32**

| | |
|---|---|
| **JESSICA KINGSLEY, Personal Representative of the Estate of Julie L. Smith, a/k/a Julie Lynn Kingsley Smith,** ) ) ) ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **MEMORANDUM OF** |
| **vs.** ) | **DECISION AND ORDER** |
| ) | |
| **BRENDA AND GENE LUMMUS, INC., d/b/a Ghost Town Harley Davidson; GENE LUMMUS HARLEY DAVIDSON, INC., d/b/a Ghost Town Harley Davidson; and TRL MOTOR SPORTS, LLC, f/k/a Ghost Town Harley Davidson,** ) ) ) ) ) ) ) ) ) | |
| ) | |
| **Defendants.** ) | |
| ——————————————— ) | |

**THIS MATTER** is before the Court on the Defendants' Motion *in Limine* to Exclude Opinion Testimony of Rolin F. Barrett, Jr. [Doc. 32] and the Defendants' Motion for Summary Judgment or Partial Summary Judgment [Doc. 33]. For the reasons that follow, the Motion *in Limine* is denied; the Motion for Summary Judgment is denied; and the Motion for Partial Summary Judgment is granted.

# I.    PROCEDURAL BACKGROUND

The Plaintiff Jessica Kingsley, as personal representative of the Estate of Julie L. Smith a/k/a Julie Lynn Kingsley Smith, brings this action against the Defendants Brenda & Gene Lummus, Inc. d/b/a Ghost Town Harley Davidson; Gene Lummus Harley Davidson, Inc. d/b/a Ghost Town Harley Davidson; and TRL Motor Sports, LLC f/k/a Ghost Town Harley Davidson, alleging claims for negligence and wanton negligence resulting in the wrongful death of the Plaintiff's decedent in a motorcycle accident. [First Supp. Am. Compl., Doc. 26]. The Plaintiff alleges that the decedent's death was caused by the improper installation of the motorcycle's front tire by an employee of Ghost Town Harley Davidson shortly before the accident. [Id. at ¶23]. The Complaint seeks both compensatory and punitive damages. [Id. at ¶¶27, 36, 41].

The Defendants Brenda and Gene Lummus, Inc., Gene Lummus Harley Davidson, Inc. (now known as Gene and Brenda Lummus, Inc.), and TRL Motor Sports, LLC move to exclude the testimony of the Plaintiff's causation expert, Dr. Rolin F. Barrett, Jr., P.E., pursuant to Rule 702 of the Federal Rules of Evidence. [Doc. 32]. The Defendants further move for summary judgment, arguing that without evidence of causation, the Plaintiff cannot

2

maintain her negligence claims. [Doc. 34]. Alternatively, the Defendants move for partial summary judgment in favor of Defendants Gene Lummus Harley Davidson, Inc. and TRL Motor Sports, LLC, on the grounds that the only proper defendant in this case is Brenda and Gene Lummus, Inc. The Defendants further move for partial summary judgment as to the Plaintiff's claim for punitive damages, arguing that there is simply no evidence to support such a claim. [Id.].

The Plaintiff filed a Response, opposing all of the Defendants' Motions. [Doc. 37]. The Defendants have filed a Reply. [Doc. 38]. Having been fully briefed, this matter is now ripe for disposition.

## II.  FACTUAL BACKGROUND

Viewed in the light most favorable to the Plaintiff, the relevant facts are as follows.

### A.  The Accident

On September 4, 2009, John and Julie Smith were riding their Harley-Davidson motorcycle from their home in Marion, South Carolina, to a motorcycle rally in Cherokee, North Carolina. Along the way, the Smiths stopped at Ghost Town Harley Davidson ("GTHD") in Waynesville for

3

replacement of the motorcycle's front tire. [First Supp. Am. Complaint, Doc. 26 at ¶¶10, 14; Deposition of Adrian Hess ("Hess Dep."), Doc. 34-1, at 74].

After leaving GTHD, the Smiths drove through Maggie Valley and along U.S. Highway 19 toward Cherokee. Going west from Maggie Valley, Highway 19 changes from two lanes to three lanes, with two west-bound lanes as the road climbs toward Soco Gap. The highway stays straight until the scene of the Smiths' fatal accident at the beginning of a curve to the right. [Deposition of Rolin F. Barrett, Jr. ("Barrett Dep."), Doc. 37-2, at 68-70; Deposition of Trooper Joseph Henderson ("Henderson Dep."), Doc. 34-1, at 65-67; Deposition of Danny Sharp ("Sharp Dep."), Doc. 34-1, at 18, 39].

Shortly before the accident occurred, Danny Sharp was driving a Ford Focus owned by his passenger, Martha Sue Catolster, traveling in a westward direction on Highway 19 toward Cherokee. [Sharp Dep., Doc. 34-1, at 13-14, 15-16]. At the point where Highway 19 becomes three lanes, Sharp noticed ahead of him two motorcycles positioned to enter the westbound lanes from an overlook. [Id. at 18]. Sharp stayed in the left (inside) lane in order to allow the two motorcycles to enter the right (outside) lane. He anticipated that he would pull into the right lane after passing the two motorcycles. The two motorcycles, however, accelerated faster than Sharp anticipated and soon

4

passed him on the right. [Id.]. Sharp intended to pull into the right lane behind the two motorcycles but saw behind him an SUV approaching in the right lane at a speed fast enough to prevent him from doing so safely. [Id. at 18-19]. As the SUV approached and began to pass him on the right, Sharp and his passenger saw a third motorcycle following closely behind the SUV. This was the Smiths' motorcycle. [Id. at 21-22; Deposition of Martha Catolster ("Catolster Dep."), Doc. 34-1, at 22].

After passing Sharp's car, the SUV and the Smiths' motorcycle pulled into the left lane, apparently intending to pass the two motorcycles which were ahead in the right lane. Sharp and Catolster saw Mr. Smith lean the motorcycle to the left to pull into the left lane. The Smiths' motorcycle was still leaning to the left when it crossed the double yellow line. [Sharp Dep., Doc. 34-1, at 22-24, 37-46, 48-51; Catolster Dep., Doc. 34-1, at 28]. Mr. Smith hit his rear brakes and fish-tailed a bit before slamming head-on into an oncoming Chevrolet driven by Nancy White. [Sharp Dep. at 22-24, 37-46, 48-51].

The Smiths were killed instantly in the collision. [NCSHP Investigation File, Plaintiff's Ex. 9, Doc. 34-2]. Photographs at the collision site showed the initial collision between the motorcycle and the Chevrolet occurred between

the motorcycle's front tire and the left front corner of the Chevrolet in the east-bound lane of the highway. [Barrett Report, Doc. 34-2, at 3; Photographs, Plaintiff's Ex. 12, Doc. 34-2]. The accident occurred less than one hour after the tire had been replaced. [Barrett Report, Doc. 34-2, at 9].

**B.    The Replacement of the Tire**

Hank Long, a GTHD technician, replaced the front tire on the Smiths' motorcycle on the day of the accident. He graduated from the Motorcycle Mechanics Institute (MMI) in Phoenix, Arizona in 2008. [Deposition of Hank Long ("Long Dep."), Doc. 34-1, at 8-9]. Long received training at MMI on the proper methods for replacing a motorcycle tire. [Id. at 40]. Additionally, when he began working at GTHD, he received instruction from the shop foreman Jason Harden on how to install a tire using the tire changing machine. [Long Dep., Doc. 37-1, at 31, 61].

Long has no specific memory of working on the Smiths' motorcycle on the day of the accident. [Long Dep., Doc. 34-1, at 39-40, 53]. He testified, however, that the procedure that he followed in changing the Smiths' tire involved "the same steps I've taken on every tire I've ever changed." [Id. at 40]. Specifically, he testified that he begins a tire replacement with breaking the bead of the old tire on both sides. This is done with the use of a tire

6

changing machine called a Coats machine. [Id. at 23]. Long testified that sometimes a hand tool known as a tire spoon is used to place the bead of the old tire onto the Coats machine. [Id. at 43]. Once the bead on the old tire is broken and the old tire, inner tube, and rim band are removed from the wheel, he uses the Coats machine to place the bottom bead[1] of the new tire under the rim flange. [Id. at 24]. With half of the tire now on the rim, he inserts the inner tube in the rim and the tire. Long testified that one of the ways he was trained to install an inner tube into a rim was to fold the inner tube and press it into the rim, but that it was his preference to install it another way. [Id. at 61-62].

Once the inner tube is inserted, it is partially inflated with the valve core out[2] so that he can conduct a visual and tactile inspection to ensure that the tube is not twisted or pinched. [Id. at 25-26]. Following that inspection, the tube is deflated and the Coats machine is used to seat the top bead of the tire under the rim flange. [Id. at 26-27]. Then a nut is installed onto the valve stem of the tube and the whole tire is removed from the Coats machine. The

_____

[1]Long explained that the edge of the tire on the side where the brake rotor is located is typically referred to as the "top bead," while the edge of the tire on the non-brake side is typically referred to as the "bottom bead." [Long Dep., Doc. 34-1, at 23].

[2]With the valve core out, the inner tube will inflate but will not hold air after the air hose is removed. [Long Dep., Doc. 34-1, at 30].

7

valve core is then installed and the tire is again inflated, which seats the bead of the tire onto the rim. [Id. at 22, 28-29]. The wheel is then set aside for three to five minutes before the air pressure is rechecked and the wheel is reinstalled on the motorcycle. [Id. at 22]. The motorcycle is then taken for a test drive before being returned to the customer. [Id. at 50-53].[3]

## C.    Plaintiff's Causation Expert

The Plaintiff retained Dr. Rolin F. Barrett, Jr., P.E. as an expert to testify regarding causation. Dr. Barrett is licensed as a Professional Engineer in North Carolina and Florida. [Affidavit of Dr. Rolin F. Barrett, Jr., P.E. ("Barrett Aff."), Doc. 37-1, at 1]. He earned a Doctor of Philosophy degree in Mechanical Engineering from North Carolina State University, a Master of Science degree in Mechanical Engineering from Louisiana Tech University, a Bachelor of Science degree in Mechanical Engineering from North Carolina State University, and a Bachelor of Science degree in Electrical Engineering from North Carolina State University. [Id. at 2]. He is a member of the National Society of Professional Engineers, a member and Board Certified

---

[3]Long testified that GTHD technicians use two different test routes: one approximately ten miles in length and the other approximately one mile in length. The ten-mile course is used for new motorcycles and for motorcycles that had major work done, such as motor repair. The one-mile course is used for minor repairs or customer concerns. Long could not recall which route he utilized to test drive the Smiths' motorcycle. [Id. at 50-52].

8

Diplomate of the National Academy of Forensic Engineers where he serves on the Committee on Accident Reconstruction and the Committee on Incident Evaluation, a member of the American Society of Mechanical Engineers, and a member of the Society of Automotive Engineers, as well as other professional organizations. [Id.]. He has conducted researched funded by the United States Army and United States Navy related to high- and low-speed impact response of composite structures, quasi-static loading of composite structures, and examination of failure mechanisms in composite structures subjected to impacts and quasi-static loading. [Id.]. Dr. Barrett teaches a senior-level course in automotive engineering at North Carolina State University. [Id. at 3]. His consulting engineering practice includes investigation of motor vehicle accidents using engineering principles. [Id.]. Since May 1986, he has analyzed or contributed to the analysis of more than 1,000 automobile, truck or motorcycle accidents. [Id.]. He has previously been qualified as an expert witness, and his testimony regarding his analyses of motor vehicle accidents has been accepted by courts. [Id.].

In preparation of his May 11, 2010 report, Dr. Barrett reviewed the North Carolina State Highway Patrol (NCSHP) accident report, the statements and depositions of the witnesses to the accident, and the photographs taken at the

scene. Additionally, he examined, measured, and photographed features of the Smiths' motorcycle. Dr. Barrett's examination led him to the following conclusions:

> The head of a spoke was observed to have protruded beyond the tire's bead seat and was resting against the tire's sidewall near the 7 o'clock position, without having perforated the tire. This spoke, which passed around the side of the tire[,] was visible in a NCSHP photograph. In order for this spoke to have missed the inner tube and tire as it was forced out of its original position, the tire and inner tube would have to be already ... deflected to the side. This deflection was consistent with the tire attempting to negotiate a curve to the motorcycle's right. Large deflections of tire can result from excessive lateral load or low tire pressure.

> Finally, recall that two cuts were observed in the inner tube, at about the same distance from the valve stem. When the inner tube adjacent to the cuts was folded approximately longitudinally, the cuts were observed to overlay, and ... no impression consistent with the head of a spoke was observed on the surface of the inner tube at either cut. Microscopic examination of these cuts showed that they appear to have been created by a tool moving against the inner tube, a pinch.

> It is the opinion of this engineer that the cuts occurred during the tire mounting process and that the inner tube may have remained folded after leaving [GTHD]. It is also the opinion of this engineer that the motorcycle's front tire pressure was sufficiently low to reduce the lateral load ability of the front tire in the

10

> curve, thereby causing the loss of control and the
> subsequent accident.

[Barrett Report, Doc. 34-2, at 9-10].

During his deposition, Dr. Barrett offered four possible mechanisms that could have cut the inner tube: a screwdriver, a tire changing tool, the Coats tire changing machine, and folding and pressing the new inner tube against the motorcycle's front wheel's center hub and spokes during the inner tube installation process. [Barrett Dep., Doc. 37-2, at 78, 82; Affidavit of Rolin F. Barrett, Jr. ("Barrett Aff."), Doc. 37-1, at 5]. In Dr. Barrett's opinion, each of these mechanisms alone would have been competent to cut the soft rubber inner tube. [Barrett Dep., Doc. 37-2, at 80; Barrett Aff., Doc. 37-1, at 5]. Dr. Barrett could not state with any certainty which of these mechanisms cut the inner tube because he was not present at the tire replacement. He opined, however, that any of these mechanisms had the means to injure the inner tube. [Barrett Dep., Doc. 37-2, at 79; Barrett Aff., Doc. 37-1, at 5].

Dr. Barrett formed his opinion that folding and pressing the new inner tube against the motorcycle's front wheel's center hub and spokes during the inner tube installation process could have damaged the inner tube after watching a video produced by the Defendant's expert, which showed an employee of GTHD folding and then vigorously pressing a new soft rubber

11

inner tube against the front wheel center hub and spokes in order to remove air from the inner tube to ease its installation. [Barrett Dep., Doc. 37-2, at 74-75; Barrett Aff., Doc. 37-1, at 6]. Dr. Barrett noted that because the hub has sharp edges as manufactured and had acquired small, sharp-edged nicks during use, the pressing of the inner tube into the hub could have damaged the inner tube. [Barrett Dep., Doc. 37-2, at 75; Barrett Aff., Doc. 37-1, at 6].

Dr. Barrett further opined that regardless of the mechanism which caused the damage to the inner tube, if the inner tube wall was not completely cut through, the inner tube would have held air when inflated, at least temporarily. [Barrett Dep., Doc. 37-2, at 85-87; Barrett Aff., Doc. 37-1, at 6]. Dr. Barrett opined, however, that as the motorcycle was ridden over the next few minutes, the partial cut in the inner tube wall would have continued to open until total failure occurred. [Id.]. Dr. Barrett opined that the sudden resulting loss of inflation of the front tire would have caused the operator to lose control of the motorcycle. [Barrett Dep., Doc. 37-2, at 90; Barrett Aff., Doc. 37-1, at 6].

## III. DISCUSSION

Because Dr. Barrett's testimony is essential to the merits of the Plaintiff's case, the Court will consider the Defendant's Motion *in Limine* first.

12

## A.    Defendant's Motion *in Limine*

### 1.    Standard of Review

Although state law controls the substantive tort issue in this diversity action, the admissibility of expert testimony in this case is governed by federal law.  See Bryte ex rel. Bryte v. Am. Household, Inc., 429 F.3d 469, 476 (4th Cir. 2005).  Rule 702 of the Federal Rules of Evidence provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The trial judge must act as a gatekeeper, admitting only that expert testimony which is relevant and reliable.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). With regard to scientific knowledge, the trial court initially must determine whether the reasoning or methodology used is scientifically valid and is

13

applied properly to the facts at issue in the trial.  Id.  To aid the Court in this

gatekeeping role, the Supreme Court has identified several key

considerations, including whether the expert opinion can be tested; whether

it has been subjected to peer review; the error rate of the methods that the

expert employed; the existence and maintenance of standards used in the

expert's methods; and whether the expert's methods are generally accepted

in the scientific community.  Id. at 592-94, 113 S.Ct. 2786; Anderson v.

Westinghouse Savannah River Co., 406 F.3d 248, 261 (4th Cir. 2005).  In

weighing these factors, the Court is guided by the following, somewhat

competing, principles:

> On the one hand, the court should be mindful that
> Rule 702 was intended to liberalize the introduction of
> relevant expert evidence.  And the court need not
> determine that the expert testimony a litigant seeks to
> offer into evidence is irrefutable or certainly correct.
> As with all other admissible evidence, expert
> testimony is subject to being tested by vigorous
> cross-examination, presentation of contrary evidence,
> and careful instruction on the burden of proof.  On the
> other hand, the court must recognize that due to the
> difficulty of evaluating their testimony, expert
> witnesses have the potential to be both powerful and
> quite misleading.  And given the potential
> persuasiveness of expert testimony, proffered
> evidence that has a greater potential to mislead than
> to enlighten should be excluded.

14

Smith v. Wyeth-Ayerst Labs. Co., 278 F.Supp.2d 684, 690 (W.D.N.C. 2003) (quoting Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999)) (internal citations and quotation marks omitted).

The objective of Daubert's gatekeeping requirement is to ensure "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The Court has broad discretion in determining whether the Daubert factors reasonably measure reliability in a given case. Id. at 153, 119 S.Ct. 1167.

### 2. Analysis

Dr. Barrett concluded that based on the nature and location of the tears in the inner tube, it was more probable than not that the tears in the front tire's inner tube contributed to the accident. Dr. Barrett identified four possible mechanisms which could have caused such tears, including the use of a screwdriver or tire spoon while installing the new tire on the rim; folding and pressing the new inner tube into the rim; and a pinch in the inner tube caused by the use of the Coats machine. The Defendants contend that Dr. Barrett's testimony regarding these four possible mechanisms is not based on sufficient

15

facts or data because there is no evidence that any of these mechanisms actually occurred in the installation process. [Doc. 34 at 13-14].

An expert's opinion must be "based upon sufficient facts or data" in order to be admissible. Fed.R.Evid. 702. "[A]n opinion based on an inadequate or inaccurate factual foundation cannot be a reliable opinion, no matter how valid the principles and methods applied or how well-qualified the expert." Snoznik v. Jeld-Wen, Inc., No. 1:09cv42, 2010 WL 1924483, at *10 (W.D.N.C. May 12, 2010) (quoting Fernandez v. Spar Tek Indus., Inc., No. 0:06-3253-CMC, 2008 WL 2185395, at *6 (D.S.C. May 23, 2008)).

Regarding Dr. Barrett's theory that the holes could have been caused by the use of a tire spoon or a screwdriver during the installation process, there are sufficient facts in the record to support this theory. According to Hank Long's testimony, he ordinarily uses a screwdriver and/or a tire spoon during the replacement of a tire. Specifically, he testified that he uses a screwdriver during the removal of the old tire to hold the axle of the wheel in place while loosening the nut that holds it to the motorcycle. [Long Dep., Doc. 34-1, at 41, 42]. He further testified that he sometimes uses a tire spoon to assist in removing the old tire from the rim prior to replacement. [Id. at 43]. The Defendants point out that while Long admitted to sometimes using these

tools during the process of removing an *old* tire, he specifically denied using any tools other than the Coats machine when installing a *new* tire onto the rim. [Id. at 42]. Critically, however, Long has no specific memory of changing the Smiths' tire on the day of the accident. He could testify only to what he normally does in the process of replacing a tire. While his description of his usual practice would indicate that he used neither a screwdriver nor a tire spoon in the installation of the new tire on the rim, his testimony does not conclusively exclude the possibility that he may have used one of these tools that he had on hand in installing the new tire on the Smiths' motorcycle. Whether or not he did so will be a factual issue for the jury to decide. For these reasons, the Court cannot say that Dr. Barrett's conclusion that the tears were possibly caused by the use of a screwdriver or other hand tool is based on insufficient facts or data so as to render such conclusion unreliable.

As for Dr. Barrett's theory that the holes could have been caused by folding and pressing the inner tube into the rim, Long testified that this method of installation was one of the ways which he was trained both at MMI and GTHD for installing an inner tube, but that it was not his preferred installation method. [Id. at 61-62]. Again, however, Long has no specific memory of replacing the Smiths' tire on the day of the accident. [Id. at 39-40, 53]. Thus,

while Long's usual practice of installing an inner tube would not involve folding and pressing the inner tube into the rim, the evidence suggests that he was trained to install inner tubes in this manner, and his testimony does not conclusively exclude the possibility that he may have folded and pressed the inner tube into the rim of the Smiths' motorcycle on the day of the accident. Again, the jury will have to resolve this factual issue. Dr. Barrett's opinion regarding this possible cause shall not be excluded for lack of a sufficient factual basis.

With respect to the possibility raised by Dr. Barrett that the use of the Coats machine may have caused the tears, the Defendants argue that this conclusion is contradicted by the testimony of Plaintiff's standard of care witness, Carl Stroud. This contention, however, is without merit. Mr. Stroud testified that using the Coats machine could in fact cause a pinch in an inner tube. [Deposition of Carl Stroud ("Stroud Dep."), Doc. 34-1, at 68]. While he stated that such a pinch would create just one hole in the inner tube "most of the time," [id. at 69, 79], Mr. Stroud's testimony does not preclude the possibility that the use of a Coats machine could cause *two* holes in a inner tube. Further, while Mr. Stroud testified that any hole created by the Coats machine would likely become apparent in a brief two-mile test drive, [id. at 70],

Mr. Stroud was not questioned about whether a Coats machine could cause damage to an inner tube wall that could later develop into a tear. Thus, his testimony also does not preclude the possibility that the Coats machine caused damage to the inner tube such that tears subsequently developed. Mr. Stroud's testimony therefore does not render unreliable Dr. Barrett's theory that the Coats machine was a possible cause of the damage to the inner tube during installation.

Next, the Defendants argue that Dr. Barrett's testimony is not the product of reliable principles and methods because he did not conduct any tests to verify any of his proffered opinions. [Doc. 34 at 14-17]. Daubert, however, "does not require an expert to perform testing before his opinion is admissible. Rather, Daubert requires that the expert's methodology be established, scientifically sound, and *subject to* testing and peer review." Tunnell v. Ford Motor Co., 330 F.Supp.2d 707, 725 (W.D. Va. 2004) (emphasis added); see also Smith, 278 F.Supp.2d at 691 ("An expert must account for 'how and why' he or she reached the challenged opinion."). Here, Dr. Barrett thoroughly explained the methodology employed in reaching his conclusions, including his review of the accident report and witnesses' statements, as well as his physical examination of the subject tire, inner tube,

19

and wheel assembly of the motorcycle involved in the accident. Dr. Barrett's explanation was sufficient to permit others with similar training and experience to review his opinions and subject them to scientific testing, which is all that Daubert requires. Of course, the Defendants will be free to cross-examine Dr. Barrett regarding his failure to conduct any testing to substantiate his theory of causation in this case. See Daubert, 509 U.S. at 596, 113 S.Ct. 2786 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). While Dr. Barrett's lack of testing may be relevant to the weight attributed to his opinions, it does not render his opinions inadmissible per se under Daubert.

For the foregoing reasons, the Defendants' Motion in Limine to exclude the testimony of Dr. Barrett is denied.

## B.    Defendants' Motion for Summary Judgment

### 1.    Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the case." News and Observer Pub. Co. v.

20

Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010).  A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record.  Fed. R. Civ. P. 56(c)(1).  "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact."  Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003).  If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist.  Id.

> A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.  Furthermore, neither unsupported speculation, nor evidence that is merely colorable or not significantly probative, will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that reasonable minds could differ on a material point, then, regardless of any proof or evidentiary requirements imposed by the substantive law, summary judgment, if appropriate, shall be entered.

21

Id. (internal citations and quotation marks omitted).

In considering the facts for the purposes of a summary judgment motion, the Court must view the pleadings and materials presented in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. Adams v. Trustees of the Univ. of N.C.-Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

### 2.    Analysis

The primary basis for the Defendants' Motion for Summary Judgment regarding the Plaintiff's negligence claims is their argument that the testimony of Dr. Barrett is inadmissible, thereby leaving the Plaintiff with no forecast of evidence to establish causation of the decedent's injuries. For the reasons set forth above, however, the Court will not exclude Dr. Barrett's opinions, and therefore, this basis for the Defendant's Motion must be rejected. The Defendants further argue, however, that even if Dr. Barrett's opinions are admissible, his testimony does not present a forecast of evidence sufficient to suggest a probability that the Defendants' actions were the cause of Ms. Smith's fatal injuries.

Because this case is a diversity action, the Court applies the substantive law of North Carolina to the Plaintiff's claims. Erie R.R. Co. v. Tompkins, 304

U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In order to establish a

common law negligence action in North Carolina, a plaintiff must establish that

the defendant owed the plaintiff a legal duty, that the defendant breached that

duty, and that the plaintiff's injury was proximately caused by the breach.

Martishius v. Carolco Studios, Inc., 355 N.C. 465, 473, 562 S.E.2d 887, 892

(2002). "When evidence raises a mere conjecture, surmise and speculation

as to causation, it is insufficient to present a question of causation to the jury."

Hinson v. Nat'l Starch & Chem. Corp., 99 N.C. App. 198, 202, 392 S.E.2d 657,

659 (1990) (citation and internal quotation marks omitted).

In the present case, Dr. Barrett's opinions are more than sufficient to to

present a genuine dispute to the jury regarding causation. Dr. Barrett opined

that it is more probable than not that the accident was caused by a sudden

deflation of the front tire, resulting from damage to the inner tube during the

installation process. Dr. Barrett's opinions regarding causation are far more

than "mere conjecture, surmise [or] speculation." See id. While the

Defendants assert that the holes in the inner tube were created upon impact

or by some outside object impaling the tire, Dr. Barrett testified that he

considered these alternative theories but was able to exclude them as likely

causes of the holes. [See Barrett Dep., Doc. 37-2, at 87-90, 103-04]. Based

upon the location of the tears, and his microscopic examination of the tears themselves, Dr. Barrett concluded that the tears were caused during the installation process. The fact that Dr. Barrett was unable to identify the precise mechanism used during installation which caused the damage does not render his opinions unduly speculative. Dr. Barrett identified four possible mechanisms, all of which would have been in the Defendants' control, and any one of which could have been used during installation and damaged the inner tube. It will be for the jury to decide how this tire was replaced and whether any of the techniques used during the replacement process caused the damage alleged.

For the foregoing reasons, the Defendants' Motion for Summary Judgment is denied.

**C. Defendants' Motion for Partial Summary Judgment Regarding Defendants Gene Lummus Harley Davidson, Inc. and TRL Motor Sports, LLC**

The Plaintiff seeks to impose vicarious liability on the Defendants for the negligence of the GTHD employee who replaced and installed the front tire of the Smiths' motorcycle. In her First Supplemented Amended Complaint, the Plaintiff alleges that Brenda and Gene Lummus, Inc. and Gene Lummus Harley Davidson, Inc. share common officers, directors, managers and

24

shareholders, and collectively operate and conduct business under the name GTHD.  [Doc. 26 at ¶¶4-6].  The Plaintiff further alleges that the Defendant TRL Motor Sports, LLC is the successor-in-interest to the business formerly known as GTHD, and that TRL Motor Sports, LLC and the other Defendants share common officers, directors, managers, and shareholders and collectively conduct business and/or are the successors to the business now or formerly known as GTHD.  [Id. at ¶¶38-39].  As such, the Plaintiff alleges, the Defendants are jointly and severally liable for the decedent's injuries.  [Id. at ¶41].

Defendants Gene Lummus Harley Davidson, Inc. (now known as Gene and Brenda Lummus, Inc.)("G&B") and TRL Motor Sports, LLC move for summary judgment with respect to the claims asserted against them, arguing that Brenda and Gene Lummus, Inc. ("B&G") was the only entity that ever did business as GTHD, and therefore is the only proper Defendant in this case. In support of their Motion, the Defendants submit the Affidavit of Brenda Lummus.  Ms. Lummus is the Vice-President of "G&B" (the entity formerly known as Gene Lummus Harley Davidson, Inc.) and the President of "B&G". [Affidavit of Brenda Lummus ("Lummus Aff."), Doc. 33-1 at ¶2].

Mr. Lummus and Ms. Lummus were the sole shareholders, officers, and directors of "G&B" and "B&G". [Id. at ¶3]. Following Mr. Lummus's death in 2010, Ms. Lummus became the sole shareholder, officer, and director of both corporations. [Id. at ¶¶2, 3].

Ms. Lummus states in her Affidavit that for several years, "G&B" operated a Harley Davidson dealership in Swannanoa, North Carolina, known as Parkway Harley Davidson. [Id. at ¶4]. Years after Parkway Harley Davidson opened, Ms. Lummus and her husband formed "B&G" in order to open a second Harley Davidson dealership in Waynesville, North Carolina, known as Ghost Town Harley Davidson ("GTHD"). [Id.]. At no time was GTHD owned, operated, or otherwise controlled by a corporate entity other than Brenda and Gene Lummus, Inc. ("B&G"). [Id.].

In the spring of 2011, "B&G" stopped doing business as GTHD. [Id. at ¶5]. The GTHD inventory of motorcycles, clothing, and parts was sold to "G&B". [Id.]. Subsequently, on May 24, 2011, "G&B" sold its existing tangible assets and business as a going concern to Asheville Motorcycles, LLC. [Id.].

Before Mr. Lummus's death in 2010, he and Ms. Lummus were the owners of the building, fixtures, and equipment at GTHD. [Id. at ¶6]. Following Mr. Lummus's death, Ms. Lummus became the sole owner of the

building, fixtures, and equipment utilized in the operation of GTHD. [Id.]. After "B&G" stopped doing business as GTHD, Ms. Lummus began renting the building, fixtures, and equipment formerly used in the operation of GTHD to TRL Motor Sports, LLC. [Id. at ¶7]. TRL Motor Sports, LLC never acquired any of the assets or accepted any of the liabilities of either "B&G" or "G&B". [Id.].

The Defendants therefore have presented a forecast of evidence to show that Parkway Harley Davidson and GTHD were operated by two separate corporate entities and that only Brenda and Gene Lummus, Inc. ("B&G") operated or otherwise did business as GTHD. In response to this forecast of evidence the Plaintiff only cites to portions of Ms. Lummus's deposition testimony in which she testified that Parkway Harley Davidson and GTHD shared the same comptroller and same employee handbook [Deposition of Brenda Lummus ("Lummus Dep."), Doc. 37-1, at 25, 27], and that she did not know whether the two dealerships shared employees or were insured together under the same insurance policies [id. at 26, 41]. This scant evidence of "sharing" between the two dealerships, however, is insufficient to create a genuine dispute as to whether Gene Lummus Harley Davidson, Inc. ("G&B") operated as GTHD or otherwise could be held vicariously liable for

the acts of a GTHD employee. Accordingly, the Defendant Gene Lummus Harley Davidson, Inc. ("G&B") is entitled to summary judgment as to the Plaintiff's claims.

As for TRL Motor Sports, LLC, the Defendants have presented a forecast of evidence to show that this entity was not a successor-in-interest to GTHD. It is merely a subsequent lessee of the building and facilities formerly occupied by "B&G". The Plaintiff offers no forecast of evidence to the contrary and thus appears to concede this issue. Having failed to demonstrate a genuine dispute as to whether TRL Motor Sports, LLC operated as GTHD or otherwise could be held vicariously liable for the acts of a GTHD employee, the Plaintiff's claims against this entity also must be dismissed.

For the foregoing reasons, the Defendants' Motion for Partial Summary Judgment is granted, and Defendants Gene Lummus Harley Davidson, Inc. and TRL Motor Sports, LLC are dismissed as parties to this action.

## D. Defendants' Motion for Partial Summary Judgment Regarding Plaintiff's Punitive Damages Claim

Under North Carolina law, punitive damages may be awarded "only if the claimant proves that the defendant is liable for compensatory damages" and that an aggravating factor such as fraud, malice, or willful or wanton

28

conduct "was present and related to the injury for which compensatory damages were awarded." N.C. Gen.Stat. § 1D–15(a). "'Willful or wanton conduct' means the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm. 'Willful or wanton conduct' means more than gross negligence." N.C. Gen. Stat. ¶ 1D-5(7). "An act is willful when there is a deliberate purpose not to discharge a duty, assumed by contract or imposed by law, necessary for the safety of the person or property of another." George v. Greyhound Lines, Inc., 708 S.E.2d 201, 205 (N.C. Ct. App. 2011) (quoting Lashlee v. White Consol. Indus., Inc., 144 N.C. App. 684, 694, 548 S.E.2d 821, 827 (2001)). "A wanton act is an act done with a wicked purpose or done needlessly, manifesting a reckless indifference to the rights of others." George, 708 S.E.2d at 205 (quoting Lashlee, 144 N.C. App. at 693-94, 548 S.E.2d at 827) (citations and alteration omitted).

Punitive damages may not be awarded against a party solely on the basis of vicarious liability for the acts or omission of another. N.C. Gen. Stat. ¶ 1D-15(c). Moreover, in a case involving a corporation, punitive damages may be awarded only if "the officers, directors, or managers of the corporation

participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages." Id.

In support of her claim for punitive damages, the Plaintiff alleges that the Defendants acted with a conscious and intentional disregard of, and indifference to, the rights of safety of the decedent by allowing their employee to install improperly the tire, tube, and other parts on the subject motorcycle in a way that was likely to cause injury and when they allowed unqualified and improperly trained employees to perform work in their garage. [First Supp. Am. Compl., Doc. 26 at ¶¶ 30, 31]. In support of these allegations, however, the Plaintiff has not presented a forecast of evidence of any willful or wanton conduct on the part of GTHD employees. Moreover, the Plaintiff has not presented any forecast of evidence that the officers, directors, or managers of the Defendants themselves "participated in or condoned" any such willful or wanton conduct. Accordingly, the Court concludes that the Plaintiff has failed to produce a forecast of evidence sufficient to support a claim of punitive damages against the Defendants. The Defendants' Motion for Partial Summary Judgment with respect to the Plaintiff's punitive damages claim is therefore granted.

# O R D E R

Accordingly, **IT IS, THEREFORE ORDERED** that the Defendants'
Motion *in Limine* to Exclude Opinion Testimony of Rolin F. Barrett, Jr. [Doc.
32] is **DENIED**.

**IT IS FURTHER ORDERED** that the Defendants' Motion for Summary
Judgment or Partial Summary Judgment [Doc. 33] is **GRANTED IN PART** and
**DENIED IN PART** as follows.  The Defendants' Motion for Partial Summary
Judgment as to Plaintiff's punitive damages claims is **GRANTED**, and the
punitive damages claim is **DISMISSED**.  The Defendants' Motion for Partial
Summary Judgment as to Defendants Gene Lummus Harley Davidson, Inc.
and TRL Motor Sports, LLC is **GRANTED**, and all of the Plaintiff's claims
against the Defendants Gene Lummus Harley Davidson, Inc. and TRL Motor
Sports, LLC are hereby **DISMISSED**.  The Defendants' Motion for Summary
Judgment as to the Plaintiff's claims of negligence against the Defendant
Brenda and Gene Lummus, Inc. is **DENIED**.

**IT IS SO ORDERED**.

Signed: March 6, 2012

Martin Reidinger
United States District Judge

31